**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHERRY A. SHEARE,** | : | **Civil No.  1:20-CV-567** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ANDREW SAUL,** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Sherry Sheare filed applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) in February of 2016 and June of 2017, respectively, alleging that she was disabled and could not work due to uncontrolled Hashimoto's hypothyroiditis, chronic fatigue syndrome, polycystic ovarian syndrome, fibromyalgia, carpal tunnel syndrome, anxiety, PTSD, ADHD, migraines, and depression. (Tr. 238). Following a hearing, her application for benefits was denied by an Administrative Law Judge (ALJ) in March of 2019, who determined that Sheare was not disabled and could perform a range of light work with postural and environmental limitations. Sheare now appeals this decision, arguing that the ALJ erred in her evaluation of the medical evidence and the plaintiff's subjective complaints. Mindful of the fact that substantial evidence

"means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   Statement of Facts and of the Case

### A. Medical History

Sheare filed for SSI in February of 2016 and DIB in June of 2017, alleging an amended onset date of disability of November 1, 2016. (Tr. 22). She alleged disability due to uncontrolled Hashimoto's hypothyroiditis, chronic fatigue syndrome, polycystic ovarian syndrome, fibromyalgia, carpal tunnel syndrome, anxiety, PTSD, ADHD, migraines, and depression. (Tr. 238). At the time of the ALJ's decision, Sheare was a 37 year old individual, had a high school education plus two years of college, was able to communicate in English, and had past work as a data entry clerk, receptionist, and administrative assistant. (Tr. 37).

The record shows that in November of 2016, Sheare saw a rheumatologist for complaints of joint pain, myalgia, and arthralgia. (Tr. 535-37). The rheumatologist noted no edema, normal motor strength, and diffuse tenderness over all tender points. (Tr. 537, 539). Later the same month, Sheare saw a pain management specialist and reported lower back, hip, and leg pain, as well as fibromyalgia. (Tr.

530). The clinical pain pharmacist, Ms. Thomas, noted that Sheare had been noncompliant with treatment until recently, as there were three no-shows and two cancellations since her last appointment. (Tr. 533). Ms. Thomas expressed concern for Sheare's high no show/cancellation rate as well as her "not being proactive in her healthcare." (Id.) Ms. Thomas specifically noted that "based on her reports of pain and the behaviors that have been documented," if Sheare continued to miss appointments and fail to be proactive in her healthcare, that Ms. Thomas could not recommend continuing high dose opioids. (Id.)

On January 19, 2017, Sheare complained to her primary care physician of weakness, fatigue, increased pain, swelling, and loss of hand strength. (Tr. 522). During the examination, she had no edema, and her motor and sensory examinations were normal. (Tr. 524). Less than a week later, Sheare again saw Ms. Thomas and had a "shopping list" of complaints, despite reportedly "doing well" at the prior appointment. Ms. Thomas recommended a decrease in Sheare's oxycodone dose based on her continued non-compliance with recommendations and lack of commitment to being proactive in taking care of herself and her healthcare. (Tr. 520). In February of 2017, Sheare complained to rheumatology of fatigue, weakness, brain fog, forgetfulness, insomnia, nausea, and dizziness. (Tr. 512-13). However, during the examination, she had no edema, normal sensation and motor strength, and diffuse tenderness over tender points. (Tr. 515).

The following month, March of 2017, Plaintiff advised her family doctor of right hip pain but said she was otherwise doing well, reporting no disturbance of motor or sensory function, no headaches or loss of balance, no edema, and no nausea. (Tr. 496). Upon examination, she had a tender hip but intact pulses and no edema. (Tr. 498). A few days later, Ms. Thomas noted that Sheare was using a rolling walker and taking up to four ibuprofen a day. (Tr. 491). She also reported that her TENS unit helped with her pain and that a recent hip injection in her left hip had been a "godsend." (Tr. 491). Sheare had diffuse tenderness to multiple tender points. (Tr. 492, 495).

In April of 2017, Sheare saw her primary care physician, who recorded that her trochanteric bursa area was very tender, but that she had good range of motion and that her knees had full range of motion, no tenderness, and no crepitation. (Tr. 485). Sheare received hip and knee injections at that time. (Tr. 485).

A few months later, Sheare was again using a rolling walker at her pain management appointment, but Ms. Thomas noted that it did not appear that Sheare depended on it, rather that she simply pushed it. (Tr. 440). Ms. Thomas made note of an abdominal CT scan in which the right ovary appeared mildly prominent, but there was no convincing finding to account for her clinical symptomatology. (Id.) Ms. Thomas spoke with Sheare about reducing her opioid dose because her pain was diffuse and varied by day and location, and Sheare agreed. (Tr. 443). Approximately

4

a week later, Sheare saw her primary care physician and complained of weakness, pain, and balance issues and noted concerns about the decrease in the dosage of her pain medication, reporting that she could not care for herself. (Tr. 434-35). On examination, she had no edema and intact pulses. (Tr. 437). Her physician affirmed the plan to decrease her pain medication dosage, but prescribed cortisol for malaise and fatigue. (Tr. 437).

In July of 2017, Sheare reported right foot numbness, dizziness, and pain in her back, neck and leg. (Tr. 414). Her doctor noted that she was complaining about pain and that despite her previously agreeing to a decrease in dosage, that she "ke[pt] coming back to her need to get 15 mg strength." (Id.) Upon examination, she had no edema and her motor and sensory examinations were normal. (Tr. 417). She had full range of motion in her back, with some lower tenderness. She also had a positive straight leg raising test on the right, so an MRI was ordered. (Id.) The MRI showed degenerative disc disease, a diffuse disc bulge at L4-5 with a superimposed broad-based central disc protrusion that appeared less focal and prominent than in a prior study, mild central spinal stenosis, and an annular tear at the L3-4 vertebrae. (Tr. 582). Later that month, Sheare saw neurology. At that appointment, Sheare presented with normal motor bulk, normal strength in all extremities, normal muscle tone, normal coordination, and normal (but slow) gait. (Tr. 412). She had a normal tandem gait and arose from her chair without difficulty. (Id.) The neurologist noted

that the most important diagnosis from her visit was subjective cognitive impairment and that her "subjective experience of her symptoms seems to be out of proportion to the objective findings. Some of the overall presentation seems part of a somaticization disorder." (Id.)

In January of 2018, Sheare reported dizziness and requested another hip injection. It was noted that she had been dismissed from pain management because of missed appointments. (Tr. 800). She had pain and restricted motion in her hip. (Tr. 801, 805). Later that month, Sheare saw Dr. Sheryl Oleski, D.O., for the first time. (Tr. 758-61). Dr. Oleski noted Sheare's complaints of pain and fatigue while observing that she exhibited no overt pain behavior, had a reciprocal gait pattern, could toe and heel walk, had functional range of motion in her shoulder, knee, and hip, reduced lumbar range of motion, and 5/5 strength. (Tr. 759). Sheare indicated to Dr. Oleski that with the assistance of her walker, she was able to complete activities of daily living independently. (Id.) Dr. Oleski also noted positive Hoffmann's tests, negative upper limb nerve tensions tests, aggravation on lumbar facet loading, minimal aggravation on right hip provocation, diffuse tenderness to palpation in knees without significant knee effusion, and no discrete tenderness in the trochanteric bursa area. (Tr. 760). She described Sheare's lumbar MRI from July of 2017 as showing "some very mild degenerative change." (Tr. 760). Dr. Oleski described Sheare's fibromyalgia as very symptomatic and recommended new

medications, additional testing, and 20 minutes of light aerobic exercise per day. (Tr. 760-61).

Upon returning to Dr. Oleski in March of 2018, Sheare reported that she had not undergone the testing that was ordered and that she was taking oxycodone more frequently than prescribed, despite prior agreement to wean her off of the medication. (Tr. 755). Upon examination, she had tenderness throughout her spine, and she was using a rolling walker. (Tr. 756). Dr. Oleski encouraged her to follow up with testing and to wean off oxycodone, as it may be worsening fibromyalgia pain. (Tr. 756). Imaging showed mild spondylosis in Sheare's cervical spine, as well as normal knees and hips. (Tr. 871, 885-87).

At her next appointment with Dr. Oleski, Sheare reported that her pain and fatigue were worse, as she was trying to take her oxycodone only sparingly. (Tr. 753). She again used a rolling walker and again exhibited no overt pain behaviors. (Tr. 754). Upon examination, Sheare had multiple fibromyalgia tender points, functional knee range of motion, positive SI provocation, 5/5 ankle strength, and a negative straight leg raising test. (Id.) A lumbar facet loading test was minimally aggravating. (Id.) Dr. Oleski encouraged Sheare to stop taking opiates, recommended an injection, and provided an orthopedic referral. (Id.)

In early June of 2018, Sheare complained to her primary care physician of SI, hip, left knee, and coccyx pain. She had no edema, normal motor and sensory exams,

and pain on flexion of her back with lower back tenderness. (Tr. 818, 822). An x-ray of her coccyx was unremarkable. (Tr. 817). In late July of 2018, Sheare visited an urgent care center, complaining of foot, ankle, and wrist injuries after a fall, but x-rays showed no apparent fracture or dislocation, only mild medial soft tissue swelling of the ankle. (Tr. 826-28, 877).

In August of 2018, Sheare had her first visit with Julio Ramos, a rheumatologist. (Tr. 741). She appeared healthy, had no edema, a normal spine to palpation, tenderness in her neck and lower back, diffuse paraspinous spasm, full extremity range of motion, no tender or swollen joints, normal grip strength, benign knee crepitus, and 14/18 tender points. (Tr. 742-43). She denied back pain, stiffness and trouble walking, dizziness, anxiety, and depression. (Tr. 742). She was encouraged to exercise and minimize her use of oxycodone. (Tr. 744). Later that month, she saw her primary care physician and reported improvement in her left foot and ankle pain, but not in her back pain. (Tr. 834). She had full range of motion in her back with lower back tenderness, a negative straight leg raising test, intact motor and sensory examinations, normal heel/toe walking, and tenderness in her ankle with good but painful range of motion. (Tr. 838).  Her fibromyalgia was characterized as stable and her current medications were noted to be effective for her degenerative disc disease. (Tr. 838).

In early September of 2018, Dr. Oleski recorded that Sheare had tapered off of opioids. (Tr. 750). Sheare complained of pain in her neck, shoulders, back, and legs. She also reported relying on her walker for support and stability. (Id.) She also indicated that her left ankle was still swollen and painful from her fall in July. (Tr. 751). She had 5/5 strength in her ankles, a negative straight leg raising test, negative hip provocation testing, aggravating sacroiliac joint provocation, and left ankle swelling. (Id.) Sheare could do a single-legged stance on the left foot and hop with pain. (Id.) Dr. Oleski recommended an MRI of the ankle and advised Sheare to continue wearing a walking boot. (Tr. 752). The following day, Dr. Ramos recorded that Sheare felt a bit better and was a bit more active, but that she was still complaining of pain and mild fatigue. (Tr. 738). Sheare had normal spine to palpation with minimal tenderness and no spasms, full range of motion in her extremities, and 6/18 tender points. (Tr. 739-40).

In early October of 2018, Dr. Oleski noted that an MRI showed a probable tear in Sheare's left foot. (Tr. 748). Sheare continued to complain of knee and back pain but continued to decline an injection for her SI joint pain. (Tr. 748). She again was using a roller walker at the appointment but did not demonstrate any overt pain behavior. (Tr. 749). That same month, an orthopedist noted that Sheare was limping, but that her knee appeared normal and her pain response was out of proportion to the examination maneuver performed. (Tr. 857). She had negative straight leg

raising tests, 5/5 motor strength, pain with hip range of motion, and pain with knee flexion and patellar grind. (Tr. 857-58). She had no arthritic hip or knee changes and no significant bony changes. (Tr. 858). Because her pain did not follow any physiologic pattern of common structural orthopedic surgery pathologies, she was encouraged to follow up with her rheumatologist. (Id.).

In late October, Sheare saw a podiatrist who noted no significant bruising or swelling on examination of her left foot, some tenderness and pain on range of motion of the left ankle and foot, tender heel to toe raise, and difficulty with weight bearing on the front part of the foot. (Tr. 892). He determined that her pain was likely caused by a foot and ankle sprain. He referred her for a wraptor brace, and she was instructed to consider physical therapy. (Id.)

A few days later, Dr. Ramos noted Sheare's complaints of widespread pain and fatigue. (Tr. 735-36). She had no edema, her spine was normal to palpation, she had tenderness in her neck and low back, minimal paraspinous spasms, full range of motion in her extremities, and 14/18 tender points. (Tr. 736-37). Dr. Ramos again encouraged Sheare to exercise. (Tr. 737).

In addition to these physical impairments, Sheare was treated at Scranton Counseling Center at the beginning of the relevant time period. (Tr. 347). In November of 2016, she reported that she was "doing good" and that the medication she was currently taking helped. (Tr. 347). She had good eye contact, normal speech,

euthymic mood, coherent thought processes, poor memory, good insight, fair judgment, impaired concentration, and adequate attending skills. (Tr. 349). Five months later, she had normal speech, euthymic mood, intact memory, coherent thought processes, adequate concentration and attending skills, and good insight and judgment. (Tr. 352-53).

Sheare did not receive any mental health counseling between April of 2017 and November of 2018. In July of 2017, she underwent testing by a neurologist for memory complaints. (Tr. 407). She scored 29/30 on a MMSE test and the neurologist noted that her subjective experience was out of proportion to the normal cognitive testing results. (Tr. 412). The same month, she complained of poor memory to a social worker but was able to share detailed information about past and present events: "She shared dates and shared what specifically occurred on each date." (Tr. 422). Throughout this period, some doctors recorded complaints of anxiety or depression (Tr. 407, 434, 756), and she was noted to be cooperative throughout. (Tr. 754, 756, 759, 794, 848).

In November 2018, Sheare had an appointment with Dr. Matthew Berger for the first time. (Tr. 898). At her intake evaluation, Sheare reported panic attacks, PTSD, depression, and anxiety. (Tr. 895). She was cooperative, anxious, sad, had intact language processing, coherent and logical thought processes, normal attention span and concentration, intact and realistic judgment, and intact and appropriate

11

insight. (Tr. 898). He also noted that her immediate, recent, and remote memory was intact. (Id.) On November 12, Dr. Berger recorded that Sheare was still anxious and depressed, but had intact language processing, coherent and logical thought processes, normal attention span and concentration, intact and realistic judgment, and intact and appropriate insight. (Tr. 900, 903). He again noted that her immediate, recent, and remote memory was intact. (Id.)

## B. ALJ Decision

It was against the backdrop of this medical record that a hearing was held on Sheare's disability application on November 29, 2018 (Tr. 44-95). At the hearing, both Sheare and a Vocational Expert testified. (Id.) Following this hearing, on March 25, 2019, the ALJ issued a decision denying Sheare's application for benefits, holding that she was not disabled. (Tr. 19-43). In that decision, the ALJ first concluded that Sheare met the insured status requirements through December 31, 2016, and she had not engaged in gainful activity since November 1, 2016, the amended date of her alleged onset of disability. (Tr. 24). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sheare suffered from the following severe impairments: degenerative disc disease of the lumbar spine, fibromyalgia, morbid obesity, asthma, attention-deficit hyperactivity disorder (ADHD), bipolar disorder, and post-traumatic stress disorder (PTSD). (Tr. 24-25). At Step 3, the ALJ determined that Sheare did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 25-27). In this discussion, the ALJ specifically considered Sheare's fibromyalgia under SSR 12-2p and whether she had medically determinable impairments that were severe, whether those impairments meet or equal any listing, and in determining her residual functional capacity. The ALJ also considered the claimant's obesity under SSR 02-1p in his assessment of Sheare's limitations.

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Sheare's limitations from her impairments, which stated that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant would be limited to occasional balancing, stooping, kneeling, crouching, use of ramps, and climbing stairs, but would need to avoid crawling and climbing on ladders, ropes, or scaffolds. She could tolerate occasional exposure to wet or slippery conditions, extreme cold, vibrations, and pulmonary and respiratory irritants such as noxious fumes, strong odors, concentrated dusts or gasses, and work environments with poor ventilation. She should avoid workplace hazards such as unprotected heights and dangerous moving machinery. She could perform jobs that would be unskilled in nature, involving only simple, routine tasks. She would be limited to jobs that are low-stress, involving only occasional simple decision making and requiring only occasional changes in the work duties or work setting. She could tolerate occasional interaction with coworkers, but would be limited to rare or incidental contact with customers or members of the general public, if any.

(Tr. 28).

In reaching this RFC determination, the ALJ considered the medical opinions of Dr. Oleski, Dr. Berger, and the state's experts: Dr. Ray and Dr. Timchack. The ALJ gave limited weight to the opinion of Dr. Oleski, Sheare's treating physician, who found that Sheare would be limited to lifting less than ten pounds, standing and walking for three total hours, sitting for six hours, and that she would need to alternate positions every ten minutes and be able to lie down every one to two hours at work. Dr. Oleski, opined that Sheare would be limited to less than sedentary work and limited to lifting less than ten pounds. (Tr. 35). The ALJ noted that this opinion was partially consistent with Sheare's subjective reports, but was not consistent with the objective medical evidence, including diagnostic test results or findings from physical examinations. (Id.) Additionally, the ALJ noted that Dr. Oleski's opinion seemed to be inconsistent with some of her own examination findings and that she partially relied on the September 2018 foot MRI in forming this opinion, but that the impairment was not severe. (Id.)

Dr. Berger, Sheare's treating psychiatrist, found that Sheare would have mostly marked or extreme limitations with her ability to perform unskilled work and a moderate limitation with her ability to understand and remember detailed instructions and her ability to carry out detailed instructions, as well as an extreme limitation with her ability to set realistic goals, make plans independently of others, and deal with the stress of semi-skilled and skilled work. (Id.)  On this score, the

ALJ again gave the opinion limited weight, reasoning that it appeared to be based on Sheare's subjective complaints rather than the objective medical evidence, including findings from objective mental status examinations. (Tr. 35-36). Furthermore, Sheare had only had two visits at Dr. Berger's office prior to the hearing, and there was a long gap in mental health treatment before she began seeing Dr. Berger. (Tr. 36). The ALJ also noted that Dr. Berger's own notes indicating that while Sheare was depressed, she had intact memory, concentration, attention, insight, and judgment while demonstrating no evidence of hallucinations, delusions, or suicidal or homicidal ideations. (Id.)

The ALJ considered the state agency physical assessment provided by Dr. Ray, finding that Sheare retained the capacity to perform a medium range of exertional work but should avoid climbing ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs, balance, stoop, and crawl, and could frequently kneel and crouch. (Tr. 34). As Dr. Ray was not a treating physician, the ALJ properly noted that he was relying solely and exclusively on examination of the medical records rather than objective long-term observations and examinations. (Id.) The ALJ gave this opinion only limited weight after consideration of all of the evidence of record, including Sheare's testimony at the hearing, finding that she was subject to more significant limitations than determined by Dr. Ray.

The last medical opinion was the state agency psychological assessment provided by Dr. Timchack, which found no limitation in understanding, remembering, or applying information, moderate limitation in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself. (Tr. 34). Dr. Timchack found that Sheare would have a moderate limitation with her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule,  maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and work in coordination with or in proximity to others without being distracted by them. (Id.) The ALJ gave the opinion great weight, as he found that it was consistent with Sheare's sporadic and conservative mental health treatment history throughout the relevant period. (Tr. 35). The ALJ also found that it was consistent with the medical evidence, including diagnostic test results and measurable findings on clinical examinations, as well as findings from objective mental status examinations. (Id.)

The ALJ also evaluated Sheare's reported symptoms and the objective medical evidence in the record. Sheare testified at the administrative hearing. (Tr. 51-87). She testified that she could not work due to pain in her back, butt, hips, and her right wrist. (Tr. 66). She also noted that transportation, even for appointments, is difficult, that she has trouble sitting, and that she uses a rolling walker prescribed

by a doctor. (Tr. 67-69). As it relates to the walker, Sheare indicated that she uses it because of pain, weakness, dizziness, and balance issues. She further stated that it was prescribed by a doctor previously and that she has been using it consistently since 2014 or 2015. (Tr. 67-68).

Regarding her mental health, Sheare testified that she experiences anxiety, which physically manifests with chest tightness, difficulty breathing, her heart pounding, a sense of doom, trouble swallowing, and a dry mouth. (Tr. 76). She indicated that her anxiety sometimes occurs on its own and is sometimes triggered by her pain. (Id.) She also testified about her PTSD being triggered when a car door shuts outside of her house, manifesting with extreme fearfulness and panic. (Tr. 76, 79). Sheare further testified about her depression and how she sometimes stares at walls, has no desire to do anything, and feels dark and dreadful. (Tr. 80). Sheare stated her mental health conditions impact her concentration and memory—she forgets words in the middle of talking, forgets why she goes into rooms, and forgets when appointments are, among other things.

Sheare further testified that her boyfriend drives her to appointments, makes food for her, does all the shopping, cleaning, and household chores. (Tr. 54, 83). However, she noted that while she normally takes the transportation van or has her boyfriend drive her to appointment, she can drive and sometimes drives herself. (Tr.

53-54). Similarly, while her boyfriend normally does all of the cooking, if she gets really hungry, she will go downstairs to make herself something to eat. (Tr. 83).

Sheare stated that she previously took up crocheting as a hobby but is unable to sit long enough to do so and her wrist and hand were hurting so much that she stopped. (Tr. 83). She testified that she spends time watching TV on YouTube on her phone, scrolling through Facebook, or talking to her mom. (Tr. 83-84). She does not belong to any community organizations or social clubs, she does not do any volunteer work, and she doesn't go out to eat or to the movies with her boyfriend. (Tr. 84).

The ALJ considered Sheare's statements, but ultimately found that they were inconsistent with the objective medical evidence of record. (Tr. 28). On this score, the ALJ reasoned that although Sheare's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence, and limited efforts of the symptoms are not entirely consistent with the medical evidence and other evidence in the record, as she was frequently attending appointments with a normal gait, in no acute distress, demonstrating good range of motion, full strength, and no edema. (Tr. 30).

At Step 4 of his analysis, the ALJ found that Sheare was unable to perform any of her past relevant work. (Tr. 37). However, at Step 5, he found that there were other jobs in the national economy that Sheare could perform, such as folder, hand

assembler, and sorter. (Tr. 37-38). Accordingly, the ALJ determined that Sheare was not disabled and denied her application for benefits. (Tr. 38).

This appeal followed. (Doc. 1). On appeal, Sheare contends that the ALJ's decision is not based on substantial evidence required under 42 U.S.C. § 405(g) because: (1) the ALJ failed to assign significant weight to the opinions of the treating physician for erroneous reasons; (2) the ALJ failed to assign significant weight to the opinions of the treating psychiatrist for erroneous reasons; and (3) the ALJ failed to present a hypothetical question containing all of Plaintiff's credibly established limitations to the VE. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, under the deferential standard of review that applies here, the Commissioner's final decision is affirmed.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993).  But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966).   "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks

20

omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts

in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11

(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any

credible medical opinion supporting a claimant's allegations of disability that "the

proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D.

Pa. 2015).

These seemingly discordant legal propositions can be reconciled by

evaluation of the factual context of these decisions. Those cases which emphasize

the importance of medical opinion support for an RFC assessment typically arise in

the factual setting where a well-supported medical source has opined regarding

limitations which would support a disability claim, but an ALJ has rejected the

medical opinion which supported a disability determination based upon a lay

assessment of other evidence. In this setting, these cases simply restate the

commonplace idea that medical opinions are entitled to careful consideration when

making a disability determination, particularly when those opinions support a

finding of disability. In contrast, when no medical opinion supports a disability

finding or when an ALJ is relying upon other evidence, such as contrasting clinical

or opinion evidence or testimony regarding the claimant's activities of daily living,

to fashion an RFC courts have adopted a more pragmatic view and have sustained

the ALJ's exercise of independent judgment based upon all of the facts and evidence.

See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the

ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence and Lay Testimony[1]

The Commissioner's regulations also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite

---

[1] The regulations ALJs are required to follow when evaluating medical opinion evidence changed, effective in March of 2017. While we note that Sheare applied for SSI in February of 2016 and DIB in June of 2017, thereby spanning this change in the regulations, Sheare concedes that the old regulations apply in her brief. Thus, the old regulations were applied here.

impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c).

In deciding what weight to accord competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. § 404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions:

length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by a number of different medical sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when weighing competing medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–

> 00158–GBC, 2015 WL 1295956, at *5 (M.D.Pa. Mar. 23, 2015);
> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); Connors v.
> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

Similar considerations govern an ALJ's evaluation of lay testimony. When

evaluating lay testimony regarding a claimant's reported degree of disability, we are

reminded that:

> [T]he ALJ must necessarily make certain credibility determinations,
> and this Court defers to the ALJ's assessment of credibility. See Diaz v.
> Comm'r, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether
> there is substantial evidence to support an administrative law judge's
> decision, we owe deference to his evaluation of the evidence [and]
> assessment of the credibility of witnesses...."). However, the ALJ must
> specifically identify and explain what evidence he found not credible
> and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d
> Cir. 1994) (citing Stewart v. Sec'y of Health, Education and Welfare,
> 714 F.2d 287, 290 (3d Cir. 1983)); see also Stout v. Comm'r, 454 F.3d
> 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide
> "specific reasons for rejecting lay testimony"). An ALJ cannot reject
> evidence for an incorrect or unsupported reason. Ray v. Astrue, 649
> F.Supp.2d 391, 402 (E.D.Pa. 2009) (quoting Mason v. Shalala, 994
> F.2d 1058, 1066 (3d Cir. 1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it
> is supported by competent medical evidence. Dobrowolsky v. Califano,

30

606 F.2d 403, 409 (3d Cir. 1979); accord <u>Snedeker v. Comm'r of Soc. Sec.</u>, 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; <u>Schaudeck v. Comm'r of Social Security,</u> 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

<u>McKean v. Colvin</u>, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in

the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may

be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

D.      **Legal Benchmarks for Assessing a Claimant's Obesity**

The interplay between this deferential substantive standard of review, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is aptly illustrated by those cases which consider analysis of the compounding effect of obesity upon disability claimants. In this regard, the leading case addressing this issue is <u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500 (3d Cir. 2009). In <u>Diaz</u>, the ALJ found at Step 2 of the analytical process that Diaz's obesity was a severe impairment, but then neglected to address the exacerbating effect of this condition at Step 3 or in any other subsequent steps in the disability analysis.

On these facts, the Court of Appeals remanded the case for further consideration by the Commissioner and provided guidance regarding the duty of articulation required from ALJs in this setting. Thus, the Court of Appeals explained that "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." <u>Diaz</u>, 577 F.3d at 504. While imposing this responsibility of articulation upon ALJs, the appellate court did not endeavor to impose some strict formulaic requirements upon these administrative adjudicators. Quite the contrary, the Court made it clear that "[t]he ALJ, of course, need not employ particular 'magic' words: '[Case law] does not require the ALJ to use

particular language or adhere to a particular format in conducting his analysis.' "
Diaz, 577 F.3d at 504 (citations omitted).

The Court of Appeals also made it abundantly clear that its decision related to the ALJ's duty to adequately articulate the rationale underlying any decision denying benefits and did not in any way alter the very deferential substantive standard of review in these cases. As the Court noted,

> Were there *any* discussion of the combined effect of [obesity upon] Diaz's impairments, we might agree with the District Court [and affirm the ALJ decision]. However, absent analysis of the cumulative impact of Diaz's obesity and other impairments on her functional capabilities, we are at a loss in our reviewing function.

Diaz, 577 F.3d at 504 (emphasis in original). By noting that "*any* discussion of the combined effect of [obesity upon] Diaz's impairments" would have been sufficient, the appellate court underscored the continuing vitality of the deferential standard of review that applies in these cases.

Thus, fairly construed, Diaz holds that where an ALJ has defined a claimant's obesity as a severe impairment at Step 2 of this analysis, there is a basic duty of articulation that is owed the claimant, explaining how that obesity affects the issue of disability. However, once that duty of articulation is met, the substantive standard of review remains highly deferential. Applying this analytical paradigm, following Diaz it has been held that a single cursory assurance that an ALJ has considered a claimant's obesity may be insufficient to satisfy the requirement that "an ALJ must

meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." Diaz, 577 F.3d at 504; see also Sutherland v. Berryhill, No. 3:17-CV-00124, 2018 WL 2187795, at *9 (M.D. Pa. Mar. 6, 2018), report and recommendation adopted sub nom. Sutherland v. Berryhill, No. CV 3:17-0124, 2018 WL 2183359 (M.D. Pa. May 11, 2018). However, a statement by an ALJ in a decision denying benefits that the ALJ has "considered any additional and cumulative effects of obesity," when coupled with even a brief factual analysis of the medical evidence as it relates to obesity and impairment is sufficient to satisfy this duty of articulation. Cooper v. Comm'r of Soc. Sec., 563 F. App'x 904, 911 (3d Cir. 2014). Further, when an ALJ considers the role of a claimant's obesity, evaluating it within the context of the overall record, consistent with the appropriate guidelines, this duty is satisfied. Woodson v. Comm'r Soc. Sec., 661 F. App'x 762, 765 (3d Cir. 2016). Finally, this responsibility is met when the ALJ explicitly considers the claimant's obesity when assessing that claimant's residual functional capacity. Hoyman v. Colvin, 606 F. App'x 678, 680 (3d Cir. 2015). Medina v. Berryhill, No. 3:17-CV-1941, 2018 WL 3433290, at *6–7 (M.D. Pa. June 8, 2018), report and recommendation adopted, No. CV 3:17-1941, 2018 WL 3426408 (M.D. Pa. July 16, 2018). It is against these legal benchmarks that we assess the instant appeal.

E.    **The ALJ's Decision in this Case is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Sheare was not disabled. Therefore, we will affirm this decision.

At the outset, Sheare's complaints regarding the evaluation of the medical opinion evidence are unavailing. On this score, Sheare contends that the ALJ failed to assign significant weight to the opinions of the treating physician and psychiatrist for erroneous reasons. She also seems to contend that the RFC derived in this case was fundamentally flawed because it was not supposed by any specific medical opinion. Lastly, Sheare argues that the ALJ failed to present a hypothetical question containing all of her credibly established limitation to the vocational expert. We find these arguments unavailing.

At the outset, we note that Sheare's argument is inconsistent with longstanding legal tenets governing judicial review of ALJ evaluation of medical opinion evidence. First and foremost, it is entirely within the province of the ALJ to determine what weight to afford competing medical opinions. See Plummer, 186 F.3d at 429; Mason, 994 F.2d at 1066; Morales, 225 F. 3d at 317. Further, the question of disability is a legal determination and is not wholly dictated by medical opinions. Thus, "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. In making this assessment of medical opinion evidence: "An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability, it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F. Supp. 3d at 214–15.

Moreover, there was significant countervailing opinion and clinical evidence presented at the hearing that objectively indicated that Sheare could perform some work. In this setting, where the plaintiff has failed before the ALJ to support her claim of disability with sufficient competent medical opinion evidence, courts have routinely rebuffed arguments that the ALJ erred in rejecting what was a factually unsupported claim of total disability. See, e.g., Naomi Rodriguez v. Berryhill, No.

1:18-CV-684, 2019 WL 2296582, at *1 (M.D. Pa. May 30, 2019); Woodman v. Berryhill, No. 3:17-CV-151, 2018 WL 1056401, at *1 (M.D. Pa. Jan. 30, 2018), report and recommendation adopted, No. 3:17-CV-151, 2018 WL 1050078 (M.D. Pa. Feb. 26, 2018); Patton v. Berryhill, No. 3:16-CV-2533, 2017 WL 4875286, at *1 (M.D. Pa. Oct. 12, 2017), report and recommendation adopted in part, No. 3:16-CV-2533, 2017 WL 4867396 (M.D. Pa. Oct. 27, 2017). The ALJ gave the opinions of Dr. Oleski and Dr. Berger limited weight and explained that they were largely based on Sheare's subjective complaints. In addition, the ALJ reviewed Sheare's complete treatment record in reaching his decision. It is entirely the province of the ALJ to weigh competing medical opinions and afford them different weight so long as the ALJ gives an adequate explanation. Morales, 225 F.3d at 317.

Furthermore, Sheare's argument discounts the fact that the RFC in this case was far more favorable to the plaintiff than the state agency expert opinion, which concluded that she could perform a medium range of exertional work. In short, by arriving at a light work RFC in this case, the ALJ construed the record in a fashion that was highly favorable to the plaintiff but was still found that she could work. Sheare may not now be heard to complain that this favorable RFC assessment was unfairly prejudicial.

Finally, regarding the hypothetical questions posed to the vocational expert, the ALJ's analysis and determination of how much weight to give to the medical

opinions renders this question moot. The ALJ explained his reasoning for giving only limited weight to Dr. Oleski's opinion. Since the opinion was only given limited weight and there was conflicting medical evidence in the record regarding whether Sheare actually needed the rolling walker[2], the use of the walker was not a credibly established impairment the ALJ was required to include in his hypothetical questions to the vocational expert.

In any event, it is apparent that the ALJ's decision in this case faithfully applied the current medical opinion evaluation regulations. The ALJ carefully examined the medical opinion evidence, evaluated its consistency with the clinical record and its persuasiveness, and concluded that the medical opinions were entitled to some weight while imposing greater limitations upon Sheare than those found by the state agency expert. There simply was no error here.

Likewise, the ALJ's evaluation of Sheare's obesity fully complied with the dictates of the law. In this regard, the ALJ correctly concluded that Sheare's obesity was a severe impairment at Step 2 of this sequential analysis. The ALJ then expressly considered this obesity throughout the disability sequential analysis, addressing her

---

[2] It is noted in the record that when Sheare did, at times, appear at appointments using her rolling walker, she did not exhibit any overt pain behaviors and it was once noted that she was not relying on the walker for ambulation, that she was merely pushing it along. (See Tr. 440, 754, 749). Furthermore, shortly after she suffered an ankle injury, Sheare was able to balance and hop up and down on her injured ankle. (Tr. 751).

obesity at Step 3; discussing this obesity when framing an RFC for Sheare; and explicitly referring to her obesity when making the ultimate disability determination in this case. In our view, this analysis met the burden of articulation demanded by the courts. It considered the role of Sheare's obesity, evaluating it within the context of the overall record, consistent with the appropriate guidelines; Woodson, 661 F. App'x at 765, and explicitly considered her obesity when assessing her residual functional capacity. Hoyman, 606 F. App'x at 680. This decision also satisfied the ALJ's duty of articulation by combining an assurance that the ALJ has considered any additional and cumulative effects of obesity in this analysis with a factual discussion of the medical evidence as it relates to both to Sheare's obesity and her medical impairments. Cooper, 563 F. App'x at 911. Moreover, substantial evidence supported the findings made by the ALJ with respect to Sheare's obesity and her ability to perform a limited range of sedentary work notwithstanding her impairments, as well as the hypothetical questions posed to the vocational expert.

In sum, in this case the ALJ was confronted by a medical record replete with conflicting clinical and opinion evidence relating to this disability claim. On these facts, the ALJ found that Sheare had not met the stringent standard for disability set by law. It is the right and responsibility of the ALJ to make such assessments and we find that substantial evidence supported the ALJ's decision in the instant case. Thus, at bottom, it appears that Sheare is requesting that this Court re-weigh the

evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Because we cannot re-weigh the evidence, and because we find that the ALJ properly articulated that substantial evidence did not support this disability claim, we will affirm the ALJ's decision in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

IV.   **Conclusion**

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

June 14, 2021